IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2021 Session

**LINDSEY BETH HONEA V. JOHN WILLIAM HONEA**

**Appeal from the Chancery Court for Rutherford County**
**No. 17CV-833      Darrell Scarlett, Chancellor**

**No. M2020-00881-COA-R3-CV**

A mother and father of three children were divorced in 2018, and both parties filed petitions to modify the permanent parenting plan later that year. Both parties also asked the trial court to hold the other party in contempt for violating the parenting plan and engaging in other objectionable conduct. The trial court found the father guilty of two counts of contempt and the mother guilty of three counts of contempt, and it ordered them to spend two days in jail for each count. The court granted the husband's petition to modify the parenting plan and changed the designation of the primary residential parent from the mother to the father. The mother appeals, and we affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Edward Evan Cope, Murfreesboro, Tennessee, for the appellant, Lindsey Beth Honea.

David Brock East, Murfreesboro, Tennessee, for the appellee, John William Honea.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Lindsey Beth Honea ("Mother") and John William Honea ("Father") were married for nearly eight years when, in May 2017, Father filed a complaint for divorce. The parties have three children who were then two, four, and six years old. Mother answered Father's complaint and filed a counter-complaint for divorce. Following a trial in February 2018, the trial court awarded Mother a divorce, named her the primary residential parent, and

awarded her transitional alimony for a year. Father was awarded 148 days of parenting time per year.

On July 9, 2018, Father filed a motion seeking to have Mother held in criminal contempt for interfering with his parenting time by refusing to transfer the children to him on July 8 as required by the parenting plan. Mother filed a motion for immediate ex parte relief on the same day, requesting that Father's sister, brother-in-law, and nephew be enjoined from being around the parties' children. According to Mother, Father's family members regularly watched the children while he was at work during his parenting time in the summer, and the parties' daughters complained that Father's seven-year-old nephew acted inappropriately while they were all together by placing objects inside their bottoms. The trial court issued an ex parte temporary restraining order prohibiting Father from removing the children from Mother's custody pending a full hearing on the matter. Following the hearing on July 19, the trial court ordered Father not to allow the parties' children to be in the presence of Father's nephew and enjoined Father from leaving the children alone with his mother for any reason.

On August 10, 2018, Mother filed a petition to modify the parenting plan to suspend Father's visitation based on the allegations supporting the restraining order granted on July 19. She amended her petition on November 27, 2019, to include counts of criminal contempt based on other conduct by Father. Father filed a counter-petition to modify the parenting plan by changing the primary residential parent from Mother to Father. He amended his petition on November 27, 2019, to include conduct for which Father alleged the court should hold Mother in criminal contempt.

The trial court held a hearing on the parties' petitions from May 11 through May 14, 2020, and it issued two separate orders on June 19, 2020: one addressing the parties' requests to hold the other party in criminal contempt and the other addressing the parties' petitions to modify the permanent parenting plan. In the Memorandum and Order addressing the parties' criminal contempt allegations, the trial court concluded that Mother was guilty of three of the six counts of criminal contempt against her.[1] The court wrote:

### Count I

> [Father's] first Count of contempt alleges [Mother] withheld the children from him on July 9 and July 10, 2018, in violation of the Permanent Parenting Plan. That week was to be [Father]'s week for summer vacation; however, a Temporary Restraining Order was signed on Wednesday, July 11 which suspended [Father]'s time. As a result, [Father] maintains he missed

---

[1]The court found Father guilty of two counts of criminal contempt and ordered him to serve four days in the county jail. However, because Father did not appeal the ruling or sentence, we will not address those counts or sanctions.

- 2 -

two days of parenting time. Through [Mother]'s testimony she acknowledges she decided on Sunday, July 8, 2018, based upon the allegations of the children, she was not going to exchange the children pursuant to the terms of the Permanent Parenting Plan and advised [Father] that due to the children's disclosures the "previous week" – involving [Father]'s mother and nephew – that she would not allow for his visitation. Of importance is the fact the allegations of abuse were not against [Father]. [Mother] acknowledges she did not tell [Father] about the allegations immediately but, rather, scheduled an appointment with the children's pediatrician. During [Father]'s parenting time which [Mother] withheld, she took the children to Indianapolis to see family members and did not return until July 9 to Tennessee.

The proof is clear beyond a reasonable doubt the Permanent Parenting Plan is clear and unambiguous, that [Mother] had the ability to comply with the terms of the Parenting Plan regarding Father's parenting time and that she willfully took the children out of state and withheld the children from [Father]. As a result, she is hereby found in criminal contempt of this Court's prior orders as to Count I.

. . . .

**Count V**

By this Count [Father] alleges [Mother] violated the terms of the Permanent Parenting Plan by denying [Father] his parenting time at the end of May, 2019. The parties' Permanent Parenting Plan, Section I.G. provides for summer vacation parenting time. Specifically, this Section provides:

> The parties shall alternate on a week-to-week basis. The father shall have the first Sunday after school is released for summer break at 6:00 p.m. until Sunday at 6 p.m. The parties shall alternate on a week-to-week basis until the Sunday prior to school resuming at which time the children will return to the mother.

The last day of school for the 2018-19 school year was Wednesday, May 29. As noted above, [Father]'s summer parenting time would have started the following Sunday at 6:00 p.m. Until that time, as summer vacation had not begun, the parties were under the day-to-day portion of their Parenting Plan. Under the day-to-day portion of the Parenting Plan, [Father] would have been entitled to parenting time on Thursday. Despite the fact the Permanent Parenting Plan is clear and unambiguous, [Mother]

inappropriately declared, unilaterally, the summer parenting schedule had begun and denied [Father] his parenting time on Thursday, May 30. The parties were before the Court on Friday, May 31 at which time the Court ordered [Father]'s parenting time reinstated.

The Court finds beyond a reasonable doubt [Mother] had the ability to comply with the Parenting Plan and willfully failed to do so and, as a result, is in criminal contempt of Court as to this Count.

## Count VI

Similar to Count V, this Count occurs at the end of summer and the beginning of the following school year. [Father] contends [Mother] began following the day-to-day schedule prematurely and, as a result, denied him parenting time. The Court finds the Parenting Plan is clear and unambiguous and the first day of school was August 6, 2019. Per the Permanent Parenting Plan, the parties were to alternate the children on a week-to-week basis during the summer "until the Sunday prior to school resuming at which time the children shall be returned to the mother." This date was Sunday, August 4. Accordingly, as of August 4, the parties were under the week-to-week portion of the Plan. The Parenting Plan grants Father parenting time every week. The parties, at the trial, were unsure whether [Father]'s parenting time was from Thursday at 3:00 p.m. until the following Monday or, alternatively, as provided for in the second paragraph of Section I.B., as amended by the parties. Regardless of which parenting time [Father] should have received, he clearly should have received some parenting time and Mother intentionally and willfully denied him the same when she had the ability to comply with the Court's Order. The least amount of time [Father] would have had would have been a period of one day and the Court finds [Father] was denied that one day period of parenting time.

Beyond a reasonable doubt [Mother] is guilty of criminal contempt as to this Count.

The trial court sentenced Mother to ten days in the Rutherford County jail for each of the three counts of criminal contempt, suspending eight days of each count "conditioned upon [Mother]'s future compliance with the Court's order, resulting in the requirement she serve six (6) days in the Rutherford County Jail."

In its order on the parties' petitions to modify the parenting plan, the court noted that the litigation between Mother and Father had been "consistent and hostile since the original complaint for divorce was filed on May 24, 2017." After summarizing the evidence presented during the trial, the court determined that the parties had established a

material change in circumstances since the entry of the divorce decree, that the change had affected the children in a meaningful way, and that the current parenting plan was no longer in the children's best interest. The court wrote, in part, the following:

> At the time of the divorce [Father], as found by the Court at that time, had a propensity toward binge drinking and alcohol abuse. As to [Mother], the divorce court found [Mother]'s willingness and ability to encourage a relationship between the children and [Father] was "*somewhat* lacking" and her actions reflected the "early cultivation of parental alienation."[2] Since the entry of the Final Decree of Divorce incorporating the Permanent Parenting Plan, [Father] continues to evidence problems with alcohol . . . . The Court finds [Father]'s issues with alcohol have not materially changed since the entry of the Final Decree. As testified to by [Mother], [Father] has always consumed alcohol during the course of his marriage and his consumption would vacillate over time.
>
> Since the entry of the Final Decree [Mother]'s "early cultivation of parental alienation" and risk of "laying the building blocks of parental alienation," as found by the divorce court have significantly escalated. . . .

---

[2]Parental alienation has been described by an expert as follows:

> [T]he most straightforward way to understand the harm from parental alienation is against the backdrop of the normal developmental support that parents provide in a healthy family. In a healthy parent/child relationship, parents provide by example and by instruction assistance in children's emotional development and their development of the capacity to relate to others in [the] development of a moral sensibility, in the development of capacity for empathy, to appreciate another person's state of mind and emotional experience.
>
> Parental alienation at one level or another undermines each of those developmental pathways so that when a child is alienated and that alienation is supported by the other parent, the parent who is supporting the alienation, whether this is their intent or not, is effectively supporting the child in cruel, unempathic behavior towards another human being, they are supporting the child in attitudes and behaviors towards interpersonal conflict that emphasize rejection, separation, and polarization, rather than resolution.
>
> Often, in dealing with the professed basis for the alienation, the child is being supported in oversimplified, polarized, black-and-white thinking, which undermines critical-thinking skills and so forth so that ultimately parental alienation is a risk to normal personality development because of those kinds of effects. To the extent that we have research on long-term outcomes of people who report having experienced parental alienation, there is certainly a basis for concern that these kinds of adverse effects can persist long-term and can have adverse effects on adult capacity for intimate relationships and on adult capacity for emotional self-regulation.

*McClain v. McClain*, 539 S.W.3d 170, 205 (Tenn. Ct. App. 2017) (citing *Varley v. Varley*, 934 S.W.2d 659, 667 (Tenn. Ct. App. 1996)).

Many of the allegations against [Father], suspiciously, immediately precede Thanksgiving, an anticipated cruise, and the beginning of his extended summer parenting time. Also, . . . despite the numerous allegations of sexual abuse and the 15-18 referrals to DCS, not one claim against [Father] or a single member of his family has been substantiated, yet [Mother] continues maintaining these claims and encourages the children to speak to people about them. Additionally, [Mother] has filed numerous petitions seeking to terminate [Father]'s parenting time with his children. These efforts on her part have negatively impacted the children. As confirmed by [Father], his relationship with the children is strained as a result of the constant allegations and, according to him, he is "walking on eggshells" when he has the children with him. . . . It is apparent from the divorce court's ruling it had hoped [Mother]'s efforts at alienation would subside; however, it is overwhelmingly clear from the evidence her efforts in this regard have significantly intensified, to the detriment of the children's relationship with their father and to their emotional detriment as well.

After considering the best interest factors set forth in Tenn. Code Ann. § 36-6-106(a), the trial court concluded that it was in the children's best interest to modify the parenting plan by changing the primary residential parent from Mother to Father and giving each party equal residential time with the children. The court specified in its order that Father was not to consume alcohol during his parenting time:

The restriction against [Father]'s consumption of alcohol contained in the most recent Temporary Restraining Order shall remain in place such that [Father] shall not consume alcohol, in any quantity whatsoever during his parenting time with the children or for the twelve (12) hours immediately preceding his parenting time. In an effort to lessen concerns in this regard, [Father] shall not have alcohol present in his home when exercising his parenting time with the children.

Mother appeals the trial court's rulings and contends the trial court erred by (1) finding her guilty of criminal contempt on Counts I, V, and VI and (2) granting Father's petition to modify the permanent parenting plan and changing the primary residential parent from her to Father.

## II. ANALYSIS

### A. Contempt Convictions

A person can violate a court order "'by either refusing to perform an act mandated by the order or performing an act forbidden by the order.'" *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *8 (Tenn. Ct. App. Feb. 23, 2018) (quoting

- 6 -

*Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510-11 (Tenn. 2005)). When a court makes a finding of contempt based on the contemnor's disobedience of a court order, "'the order alleged to have been violated must be clear, specific, and unambiguous.'" *Id.* (quoting *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008)). Courts may punish contempts of court based on a party's "willful disobedience" of any lawful order of the court. Tenn. Code Ann. § 29-9-102(3); *Mawn v. Tarquino*, No. M2019-00933-COA-R3-CV, 2020 WL 1491368, at *3 (Tenn. Ct. App. Mar. 27, 2020).

A finding of criminal contempt requires evidence of "'(1) a court order, (2) the defendant's violation of that order, and (3) proof that the defendant willfully violated that order.'" *Pruitt v. Pruitt*, 293 S.W.3d 537, 545 (Tenn. Ct. App. 2008) (quoting *Foster v. Foster*, No. M2006-01277-COA-R3-CV, 2007 WL 4530813, at *5 (Tenn. Ct. App. Dec. 20, 2007)). The moving party must also show that (1) "the order allegedly violated was lawful," (2) "the order was clear and unambiguous," (3) the defendant "did, in fact, violate the order," and (4) the defendant's violation was willful. *Mawn*, 2020 WL 1491368, at *3 (citing *Konvalinka*, 249 S.W.3d at 354-55; *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011)). "In the context of criminal contempt, willfulness has two elements: (1) intentional conduct; and (2) a culpable state of mind." *Renken v. Renken*, No. M2017-00861-COA-R3-CV, 2019 WL 719179, at *6 (Tenn. Ct. App. Feb. 20, 2019) (citing *State v. Beeler*, 387 S.W.3d 511, 523 (Tenn. 2012); *Konvalinka*, 249 S.W.3d at 357). A person's acts are intentional when the person has the "'conscious objective or desire to engage in the conduct or cause the result.'" *Id.* (quoting Tenn. Code Ann. § 39-11-302(a)).

"A person charged with criminal contempt is 'presumed innocent'" and may not be found guilty "'in the absence of proof beyond a reasonable doubt that they have willfully failed to comply with the court's order.'" *Pruitt*, 293 S.W.3d at 545 (quoting *Long v. McAllister-Long*, 221 S.W.3d 1, 13 (Tenn. Ct. App. 2006)); *see also Mawn*, 2020 WL 1491368, at *3. Once a trial court finds a defendant guilty of criminal contempt, the presumption of innocence the defendant enjoyed at trial is replaced with a presumption of guilt on appeal. *Black v. Blount*, 938 S.W.2d 394, 399 (Tenn. 1996). A defendant appealing a finding of criminal contempt has the burden of "illustrating why the evidence is insufficient to support the verdict of guilt." *Pruitt*, 293 S.W.3d at 545 (citing *Black*, 938 S.W.2d at 399); *see also Mawn*, 2020 WL 1491368, at *3.

"After a permanent parenting plan has been incorporated into a final order or decree, the parties are required to comply with it unless and until it is modified as permitted by law." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017); *see also Armbrister v. Armbrister*, 414 S.W.3d 685, 697 (Tenn. 2013). All three counts of criminal contempt against Mother arise from her violation of the parenting plan that was a part of the trial court's divorce decree in 2018. Section I.B. of the plan is titled "Day-to-Day Schedule" and states as follows:

The Mother shall have responsibility for the care of the children except at the following times when the other parent shall have responsibility:

> From Thursday at school release or 3:00 p.m. if school is not in session to Monday when he shall return the children to school or 8:00 a.m. if school is not in session every other weekend.
>
> On the weeks the Father does not have weekend visitation the Father shall exercise parenting time on Wednesday[3] from school release or 3:00 p.m. if school is not in session to Thursday when he shall return the children to school or 8:00 a.m. if school is not in session.
>
> The Father's weekend visitation shall begin on Thursday, March 22, 2018.

Section I.G. of the parenting plan is titled "Summer Vacation," and it provides that:

> The parties shall alternate on a week-to-week basis. The Father shall have the first Sunday after school is released for summer break at 6:00 p.m. until Sunday at 6:00 p.m. The parties shall alternate on a week-to-week basis until the Sunday prior to school resuming at which time the children shall be returned to the Mother.

Count I

Count I is based on Mother's failure to transfer the children to Father for the week of July 8, 2018, when the children were on their summer vacation. Mother does not challenge the trial court's finding that she violated the court's order or that the order was unambiguous. She contends that she was not "willful" in her violation of the order because she did not undertake to violate the order "for a bad purpose." Mother testified as follows:

> Q: Now leading up to that week, what's called the week you had with the children before July 8[th], you and your ex-husband had been doing a week-on, week-off parenting schedule for that summer. Is that fair?
>
> A: Yes.

---

[3]The evidence showed that the parties agreed that Father would have parenting time on Thursdays rather than Wednesdays in the weeks when he did not have weekend visitation.

Q: So it's fair to assume [Father] was going to have the children on that Sunday until you told him that wasn't going to happen; is that right?

A: Yes.

Q: He expected them?

A: Right. That would have been the exchange day, yes.

Q: You said sometime that week before the children had made some disclosures to you; is that right?

A: Yes.

Q: When they made these disclosures, those disclosures involved my client's mother and his nephew; is that right?

A: Yes, I believe so, yes.

Q: And these are the same individuals that had previously been accused of inappropriate touching of your children; is that right?

. . . .

A: Yes, that's correct.

. . . .

Q: When they [the children] disclosed this, I take it on either a Monday or Tuesday - - you said a day or two after you got [them] back. You get them back on Sunday, right?

A: Right.

Q: So on Monday or Tuesday when they disclosed this to you, do you tell [Father]?

A: I don't believe so.

Q: At some point thereafter you schedule an appointment with Dr. Bradley, the primary care - - or the pediatrician, right?

- 9 -

A: Yes. After [the youngest child] had used the restroom in her pants twice, I then thought maybe something was wrong or something had happened, so yes, I called the pediatrician.

Q: And you set up that appointment for - - was it Wednesday? Is that right?

A: Wednesday or Thursday of that week.

Q: When you called, you set up that appointment for your children then, did you then go ahead and tell [Father], hey, look, I'm scheduling this appointment, it's to discuss these issues, these allegations?

A: I don't - - I don't remember specifically when I shared this incident with him. I can't recall exactly.

Q: But you do recall exactly not until Sunday telling him that he wasn't going to get the time that he was expecting?

A: Right.

. . . .

Q: Again, up to that point [Father] had no knowledge of the fact that this was going to be talked about, brought up or even been alleged by his children. Isn't that right?

A: No, not at this point.

. . . .

Q: And their whole lives, your whole marriage, et cetera, there had never been an allegation of inappropriate touching at this point against [Father] - - your ex-husband, true?

A: That is true.

The evidence showed that Mother drove the children up to Indianapolis to see her family on Friday, July 6, and did not return home with them until Monday, July 9, which was one day after she was supposed to transfer them to Father. Mother did not inform Father until Sunday, July 8, that he would not get the children that day. Mother moved for a restraining order against Father's family on July 9, 2018, but she did not seek any relief against Father.

Mother cites *Miller v. Miller*, No. M2014-00281-COA-R3-CV, 2015 WL 113338 (Tenn. Ct. App. Jan. 7, 2015), in support of her argument that the trial court erred in holding her in criminal contempt for failing to transfer the children to Father on July 8. In *Miller v. Miller*, the mother refused to deliver her children to their father due to sexual abuse allegations against the father. *Miller*, 2015 WL 113338, at *2. The mother was living in Wisconsin, and a social worker employed by a local department of human services investigated the allegations and wrote a letter recommending that the children's visitation with the father be suspended until the investigation was completed. *Id.* The investigation was ultimately concluded with no actions taken against the father, and the father moved for the mother to be held in criminal contempt for failing to comply with the parenting plan. *Id.* at *3. The trial court found the mother guilty of criminal contempt, and she appealed. *Id.* at *4.

On appeal, we considered whether the mother's violation of the court's order was "willful." *Id.* at *10. We stated that "'[i]n the criminal context, a willful act is one undertaken for a bad purpose.'" *Id.* (quoting *Konvalinka*, 249 S.W.3d at 357). Acknowledging that the mother had failed to comply with the court's order by transferring the children to the father for his scheduled parenting time, we determined that she did not withhold the children for "a bad purpose" and reversed the trial court's order finding the mother guilty of criminal contempt. *Id.* We concluded that the mother "did not intend to flaunt the orders of the Davidson County court" and that her decision to withhold the children reflected her concerns about sending the children to spend time with the father after receiving the recommendation by the local department of human services not to do so. *Id.*

In contrast to the case at bar, before his parenting time was scheduled to start, the father in *Miller* was made aware of the sexual abuse allegations and was provided with the letter from the social services agency recommending that his visitation be suspended pending the investigation's conclusion. *Id.* at *2. Here, the trial court focused on the following facts when it held Mother was guilty of criminal contempt for Count I: (1) the children's disclosures were against Father's mother and his seven-year-old nephew, not against Father; (2) Mother did not inform Father about the children's allegations until several days after the allegations were made, after Mother brought the children in to see their pediatrician; and (3) Mother arranged for the children to be in Indianapolis on the day they were supposed to go to Father. Despite Mother's claim that she was trying to protect the children from inappropriate touching, the court found that Mother's testimony was "not credible" insofar as it related to "allegations of wrongdoing by [Father] and his family."

Mother fails to illustrate how the evidence introduced at trial was insufficient to support the trial court's verdict of guilt. *See Pruitt*, 293 S.W.3d at 545. As a result, she has not overcome the presumption of guilt on appeal. *See Black*, 938 S.W.2d at 399. We affirm the trial court's conviction of Mother for criminal contempt on Count I.

Counts V and VI are based on Mother's failure to comply with the parenting plan after the children's school ended in May 2019 (Count V) and again before the start of school in August 2019 (Count VI). The final day of the children's 2018-19 school year was on Wednesday, May 29. According to the terms of the plan, the Summer Vacation schedule did not go into effect until the first Sunday following the children's release from school. Section I.G. of the plan provided for the parents to alternate weeks with the children during the summer and stated: "The Father shall have the first Sunday after school is released for summer break at 6:00 p.m. until [the following] Sunday at 6:00 p.m." Until the first Sunday following the children's release from school, therefore, the parties were operating under Section I.B. of the parenting plan, which, on that particular weekend, meant that Father was to have parenting time from Thursday at 3:00 and continuing through the weekend. The trial court found Mother was guilty of criminal contempt for refusing to transfer the children to Father on the Thursday before the Summer Vacation schedule began, when the parties were required to follow the Day-to-Day schedule of the parenting plan.

Count VI is based on Mother's refusal to transfer the children to Father in August 2019, once school had started again. Under the terms of the parenting plan, the Summer Vacation schedule was operative until the Sunday before school started. The children's school began during the week of August 5, 2019, which meant that the Day-to-Day schedule was in effect that week. Mother refused to transfer the children to Father on Thursday, August 8, as she was required to do. The evidence did not reveal whether Father was entitled to just an overnight or a full weekend with the children that week, but, as the trial court wrote, "[r]egardless of which parenting time [Father] should have received, he clearly should have received some parenting time" that week.

Mother asserts that the parenting plan was ambiguous with regard to when the Summer Vacation schedule was to begin in May 2019 (Count V) and when the Summer Vacation schedule was to end in August 2019 (Count VI). Mother correctly states that the order she is charged with violating "must be clear, specific, and unambiguous." *In re Samuel P.*, 2018 WL 1046784, at *8.

> "A person may not be held in [ ] contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.
>
> Vague or ambiguous orders that are susceptible to more than one reasonable interpretation cannot support a finding of [ ] contempt. Orders need not be full of superfluous terms and specifications adequate to counter any flight of fancy a contemnor may imagine in order to declare it vague.

They must, however, leave no reasonable basis for doubt regarding their meaning.

Orders alleged to have been violated should be construed using an objective standard that takes into account both the language of the order and the circumstances surrounding the issuance of the order, including the audience to whom the order is addressed. Ambiguities in an order alleged to have been violated should be interpreted in favor of the person facing the contempt charge. Determining whether an order is sufficiently free from ambiguity to be enforced in a contempt proceeding is a legal inquiry that is subject to de novo review."

*Id.* (quoting *Konvalinka*, 249 S.W.3d at 355-56 (citations and footnotes omitted)). Applying these principles to the facts before us and considering the circumstances of the parties, we conclude that the language of the parenting plan is unambiguous.

Contrary to Mother's argument, the language in Sections I.B. and I.G. is not susceptible to more than one interpretation and is not ambiguous. The parenting plan clearly provides that the Day-to-Day schedule remains in effect until the first Sunday following the end of the school year, at which time the Summer Vacation schedule will begin, and that the Summer Vacation schedule ends the Sunday before school starts again for the following school year, at which time the Day-to-Day schedule will go back into effect. *Cf. Adkisson v. Adkisson*, No. E2012-00174-COA-R3-CV, 2013 WL 936369, at *5-6 (Tenn. Ct. App. Mar. 11, 2013) (finding terms of parenting plan ambiguous where parents were to alternate spring break vacations but plan did not specify whether "spring break" was to include) surrounding weekends). The trial court put the parenting plan into place in March 2018, more than a year before the events leading up to the trial court's finding Mother in violation of its terms. Mother points to no evidence showing that they were unable to follow the same schedule at the end of the 2017-18 school year or the beginning of the 2018-19 school year. Mother fails to demonstrate that the evidence was insufficient to support the trial court's guilty verdicts on Counts V or VI. Accordingly, we affirm the trial court's judgment finding Mother guilty of criminal contempt on Counts V and VI.

B. Modification of Parenting Plan

1. Standard of Review and Legal Principles

Our review of a trial court's findings of fact is de novo on the record, and we apply a presumption of correctness to the findings unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *C.W.H.*, 538 S.W.3d at 495 (citing *Armbrister*, 414 S.W.3d at 692-93). With regard to the modification of a parenting plan, our Supreme Court has written:

- 13 -

"A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings."

*C.W.H.*, 538 S.W.3d at 495 (quoting *Armbrister*, 414 S.W.3d at 692-93). Trial courts have "broad discretion in formulating parenting plans" because of their ability to observe the witnesses and assess their credibility. *Id.* (citing *Armbrister*, 414 S.W.3d at 693); *see also Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) ("Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility"); *Williamson v. Lamm*, No. M2015-02006-COA-R3-CV, 2016 WL 5723953, at *3 (Tenn. Ct. App. Sept. 30, 2016) (explaining that appellate courts hesitate to second-guess a trial court's rulings on custody and residential schedules because rulings often turn on the parents' demeanor and credibility at trial). As a result, we employ a "*limited* scope of review" of a trial court's factual findings in cases involving the primary residential parent designation and residential parenting schedules. *C.W.H.*, 538 S.W.3d at 495 (citing *Armbrister*, 414 S.W.3d at 692-93).

Appellate courts review a trial court's parenting plan for an abuse of discretion and "should not overturn a trial court's decision merely because reasonable minds could reach a different conclusion." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011); *see also C.W.H.*, 538 S.W.3d at 495. "This standard does not permit an appellate court to substitute its judgment for that of the trial court, but 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Gonsewski*, 350 S.W.3d at 105 (quoting *Henderson v. SAIA, Inc.,* 318 S.W.3d 328, 335 (Tenn. 2010)). "'Appellate courts should reverse custody decisions 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence.'" *C.W.H.*, 538 S.W.3d at 495 (quoting *Kelly v. Kelly*, 445 S.W.3d 685, 696 (Tenn. 2014)). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Armbrister*, 414 S.W.3d at 692.

When a petitioner seeks to change the primary residential parent, he or she must initially prove by a preponderance of the evidence that there has been a "material change of circumstance." Tenn. Code Ann. § 36-6-101(a)(2)(B); *C.W.H.*, 538 S.W.3d at 496. In this context, "[a] material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or

circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). There is no bright-line test for determining when a change of circumstances is material enough to support a change in the primary residential parent. *McClain v. McClain*, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017). Some general guiding principles are that "the changed circumstances must have arisen after the entry of the order sought to be modified," and they "must not have been reasonably anticipated when the underlying decree was entered." *Id.* (quoting *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004)). If the petitioner makes these showings, the trial court then conducts a best interest analysis by applying the factors set out in Tenn. Code Ann. 36-6-106(a) to the facts of the case. *C.W.H.*, 538 S.W.3d at 496 (citing *Armbrister*, 414 S.W.3d at 697-98). Whether a material change of circumstance has occurred is a question of fact. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

If a party seeks a modification of the parenting schedule only, the party must prove by a preponderance of the evidence that there has been "a material change of circumstance affecting the child's best interest." Tenn. Code Ann. § 36-6-101(a)(2)(C). The Supreme Court has interpreted this section as "set[ting] 'a very low threshold for establishing a material change of circumstances' when a party seeks to modify a residential parenting schedule." *Armbrister*, 414 S.W.3d at 703 (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007)). The party requesting a change to the parenting schedule is not required to show that the material change in circumstance could not have been anticipated when the initial residential parenting schedule was made. *Id.* "To modify the residential parenting schedule, a showing that the current schedule is not workable for the parties can be enough to satisfy the material change of circumstances standard." *Drucker v. Daley*, No. M2019-01264-COA-R3-JV, 2020 WL 6946621, at *6 (Tenn. Ct. App. Nov. 25, 2020) (citing *Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015)). If a party requesting a change in the parenting schedule proves a material change of circumstances, the trial court will then conduct a best interest analysis to determine if a change to the schedule is warranted. *Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *4 (Tenn. Ct. App. Apr. 29, 2015).

### 2. Trial Court's Decision

In ruling that Father established a material change in circumstances and that changing the primary residential parent from Mother to Father was in the children's best interests, the trial court reviewed the evidence presented at trial and conducted a best interest analysis by considering the factors set forth in Tenn. Code Ann. § 36-6-106(a). Mother contends that the trial court abused its discretion by reaching an illogical or unreasonable decision in light of the evidence or based its decision on a clearly erroneous assessment of the evidence. She argues that the trial court failed to properly consider the testimony of the expert it appointed to conduct Rule 35 examinations of the parties, the

- 15 -

testimony of the counselor it appointed to provide counseling to the children, or the evidence of Father's alcohol abuse. Mother wanted Father's visitation with the children to be suspended or supervised "until he gets the help that he needs to be healthy, in remission, able to be the best dad that he can be for these children." Mother also contends the court improperly found she had engaged in parental alienation.

In addition to the parties, the following witnesses testified at the four-day trial: detectives from the Rutherford County Sheriff's office, a captain from the Humphreys County Sheriff's Department, an employee of the Child Advocacy Center, a court-appointed counselor for the children, some of the children's teachers and school counselors, a babysitter, and Father's parents. Mother also introduced into evidence the deposition and report of the psychiatrist the court appointed to perform a Rule 35 examination upon both Mother and Father, the deposition of the children's pediatrician, and a transcript of the testimony from an earlier proceeding of Father's former girlfriend.

Mother testified that she filed a dependency and neglect petition against Father in the fall of 2018 based on information Father's former girlfriend, Dawn Hively, conveyed to her about Father's excessive drinking around the children and inappropriate interactions with them. Mother testified that the dependency and neglect petition was ultimately dismissed due to insufficient evidence.

Mother acknowledged that the children's allegations against Father's mother and nephew were investigated by the Department of Children's Services ("DCS") and the Humphreys County Sheriff's Department and that the investigations were eventually closed due to insufficient evidence of any wrongdoing. The children's allegations led Mother to make two referrals to DCS: once in December 2018 or January 2019, and once in the spring of 2019. The first referral related to allegations of inappropriate touching of the eldest child by Father's mother during the Christmas holidays, and the second referral was based on the eldest child's report to Mother that Father had touched her inappropriately while the two were sleeping in the same bed. Mother testified that the children made additional allegations against Father but that she did not make any more referrals to DCS or any other entity because the children were seeing a counselor and Mother was leaving it up to the counselor to determine whether another referral was warranted. At one point in the winter or spring of 2019, two of the parties' children told Mother they had lied about the inappropriate touching. Mother testified:

> Q: Have your children - - any of them, have they ever recanted one of their allegations?
>
> A: Yes. Let me rephrase that. The girls came back from [Father]'s house several weeks ago, and immediately got in the car and said, "Mommy, we lied about everything."

- 16 -

Q: And what did you say?

A: Well, first I said - - pulled the car over. I said, "What do you mean, you lied about everything? What does that mean?"

[One of the girls] said, "Daddy never touched us, his mom never touched us, [our cousin] never touched us."

I got upset. I started crying because it was devastating after everything we had gone through, everything - - everything. I didn't know how to take it. My son, on the other hand, was over there, started crying. He said, "No, Mommy, no, Mommy. Daddy told them to say that. Daddy told them to say that."

So then I did not get upset at the girls. I said, "Did Daddy tell you to say that to me?," and [the eldest child] said, "Yes, Daddy and Grandma told us they would take us on a vacation if we told you that everything - - we made everything up."

Q: What did you do with that information?

A: Well, the girls then came back. They told me that it wasn't true. They said they had lied about lying. It was confusing.

Mother acknowledged that the children love Father and that it was not her goal for the children to have no residential time with him. She testified that she wanted them "to have the dad they deserve." Mother's attorney asked her the following question:

If [Father] follows the recommendation of Dr. Montgomery and Jamie Langley, under the supervision of this court, are you comfortable with whatever Dr. Montgomery, Dr. Langley, and this court come up with, with respect to [Father]'s residential time with these children?

Mother responded, "Yes. All I want is for the kids to be safe. That's it."

Father testified that he was an engineer and that he had not been disciplined for any work performance issues. As of the time of trial, he lived in the house the parties shared when they were married, and he stated that he had no plans to move. When the children were at Father's house, his daughters shared a bedroom and his son had his own bedroom. Father stated that he had been investigated by DCS officers from Rutherford County, Dickson County, and Humphreys County based on allegations of inappropriate touching or sexual abuse by him or his family members, and that all of the investigations had been closed due to insufficient evidence of wrongdoing. Father denied ever touching any of the

children inappropriately. He testified that at one point after an allegation of abuse had been made against him and it was being investigated, the eldest child recanted her accusation. According to Father, the child told him, "Daddy, it's not true. I know I lied. I don't know why I lied."[4]

Father said that he and the children have a lot of fun when they are all together and that they do "normal daddy-kid stuff." He said that things seemed to change when they left and returned to Mother. When asked how all of the DCS investigations affected the way he parents the children, Father responded that he "walk[s] on eggshells" around them. When Father was asked about his consumption of alcohol, he responded:

> I've never been drunk with the kids. . . . [P]ost-divorce I don't drink around the kids. I know I'm the only one to take care of them.

Father testified that he had never been disciplined at work for alcohol-related issues and had never been pulled over on the road for driving drunk. Father denied that he had a drinking problem or needed to stop consuming alcohol. Father's mother and father also testified that they did not believe Father abused alcohol.

Father testified that he wanted to be named the primary residential parent so that the children would be zoned for the school near his house and not be changing schools whenever Mother moved.[5] Father stated his opinion that it would be in the children's best interest if he and Mother shared time with the children equally.

Charlie Borel was a counselor at the children's school, and she testified that the middle child reported that Father "was aggressive, rough, yelled a lot, drank a lot, and touched them inappropriately." Ms. Borel then spoke with the eldest child, who confirmed the things the middle child reported and said those things usually happened "after there's been too much alcohol." When Ms. Borel showed the elder child a doll and asked her to indicate where she and her siblings were being touched, the child pointed to the lower back below the waist. According to Ms. Borel, Mother encouraged the children to talk with people whom they thought could help them, but Ms. Borel had no reason to believe Mother coached the children to make specific reports about Father.

Jennifer Myers was a teacher at the children's school, and she testified that she made a referral to DCS after the eldest child told her about concerns surrounding Father's drinking. The child told Ms. Myers that Father was drinking alcohol while he was driving

---

[4]Father also testified that the eldest child told him that one of Mother's nephews had touched her inappropriately. According to Father, Mother was aware of this accusation but did not share this information with Father and only acknowledged it when Father asked her about it.

[5]The evidence reflected that Mother had moved a few times after the parties' divorce and that her moves had the effect of changing the schools the children attended.

the children around on Halloween in 2019. Ms. Myers testified that the same child told her that Father had "grazed her butt" as he was walking behind her and that this contact made the child uncomfortable. Ms. Myers did not report this incident to DCS because she did not believe a referral was warranted.

Sarah Parker was a teacher, and she testified that when she was the eldest child's second-grade teacher in the fall of 2018, the child sought her out to talk about Father's drinking. Ms. Parker testified that the child complained about the amount Father drank, that Father did not feed her and her siblings while they were with him, and that Father "would look at images of women without clothes on around her when she was there." As a result of the child's reports to her during the school year, Ms. Parker made two different referrals to DCS.

Tara Davis was the director of children's services at the Child Advocacy Center in Rutherford County, and she testified that she provided in-home services to the parties' children after receiving a referral from DCS. Ms. Davis explained that she offered in-home counseling services to families affected by alcohol and/or substance abuse. She met with the children five or six times in 2019 and testified that the eldest and youngest children told her that Father had "touched them on their bottom" while they were on a cruise. Ms. Davis made a referral to DCS for further investigation.

Patty Oeser was a family crimes detective from the Rutherford County Sheriff's Department, and she testified that her department received a referral from DCS in 2019 based on allegations of abuse against the children during a cruise. Ms. Oeser watched an interview of the children by the Child Advocacy Center and then conducted an interview of Father. Ms. Oeser stated that Father was "very upset about the allegations and he actually suggested taking a polygraph." Ultimately, no charges were brought against Father and the case was closed.

Will Pinson was a criminal investigations detective at the Rutherford County Sheriff's Office, and he testified that he became aware of allegations of abuse by Father against the children in October 2019. A resource officer at the children's school made a referral to Mr. Pinson's supervisor, and Mr. Pinson drove out to the school. After learning that DCS was being notified of the allegations, Mr. Pinson contacted Father and asked him to come in for an interview. Sarah Deharde, who was a case manager from DCS, conducted the interview, and after listening to it, Mr. Pinson determined there was insufficient evidence to pursue criminal charges against Father. Before Mr. Pinson closed the case, however, Ms. Deharde informed him that another allegation of inappropriate touching had been made against Father. A Child Advocacy Center employee conducted a forensic interview with the children, which Mr. Pinson reviewed.

Mr. Pinson noted inconsistencies among the children's statements and stated:

> Paired with my knowledge that he had denied the allegations, the lack of any physical evidence of a crime, Sarah [Deharde] and I basically discussed, and I told her that I didn't have enough evidence to proceed with any kind of criminal charges in this case. There was some suspicion on our part that the children may have been coached by somebody to make accusations against their father.

When asked why he believed the children may have been coached, Mr. Pinson responded:

> Well, the timing of the complaints. The Honeas were involved in child custody proceedings. Mr. Honea had been accused multiple times by the children. He had cooperated with investigations up to this point. Investigations had failed to find any evidence that he had actually - - other than the statements of the children, that he had actually sexually abused them.
>
> The timing of the new complaint was suspicious to me, because as soon as we told the family that we wouldn't be proceeding with the initial investigation I was involved in, almost immediately after a new allegation popped up.
>
> That was suspicious to me, yet the allegations seemed to escalate in severity over the course of a couple of years, and there had been no prior allegations of abuse against Mr. Honea to my knowledge prior to 2017.

Mr. Pinson stated that his department closed the case against Father around Christmas 2019. Then, in April 2020, a month before the trial, Mr. Pinson testified that another referral had been made to DCS that he and Ms. Deharde (from DCS) were investigating. Mr. Pinson stated:

> The children made some concerning comments to their mother after a recent visit to their father's. We interviewed the father. He's denied doing anything inappropriate. Sarah Deharde has made some recommendations to the father which, as far as I can tell, he's kept. I've asked the father to take part in a computer voice stress analysis exam. It's another - - what people would refer to as a lie detector test. He has agreed. We haven't conducted it yet. That's where we're at.

Mr. Pinson stated that he and Ms. Deharde stopped by Father's house the week before the trial "as soon as [Father] got the kids" to check on the children's welfare and the condition of the house. At that point, Mr. Pinson said, everything looked fine. When asked what recommendations Ms. Deharde had made to Father, Mr. Pinson responded that they

included being sure the children had their own bedrooms and setting up cameras in common areas of the house and in the father's bedroom.

Captain Clay Anderson was employed with the Humphreys County Sheriff's Office and was the commander of the criminal investigation division. He testified that two different referrals came into his office from DCS regarding reports of sexual abuse of the Honea children by Father's nephew and Father's mother. Captain Anderson stated that a forensic interview of the children was conducted, the suspects were interviewed, and that in both cases the allegations were unsubstantiated. Captain Anderson testified that the investigation had not been closed yet because of "lingering questions about [Mother] and her failure to cooperate during the investigation."

A college student whom Father hired to watch the children while he was at work in the summers also testified. She stated that she had never seen Father act inappropriately with the children and that she had seen nothing she would describe as "inappropriate" in Father's house. The babysitter said that the children seemed to love and care for Father and seemed happy "being in the neighborhood, being under his roof." The babysitter testified that she had never observed Father drinking or intoxicated and that she had not seen any alcohol in the house.

The trial court appointed Stephen A. Montgomery, M.D., to conduct psychiatric parenting evaluations of both Mother and Father. Dr. Montgomery was deposed prior to trial, and his deposition testimony and written evaluation were entered as evidence. Dr. Montgomery concluded that Father suffered from an "alcoholic use disorder," which he stated was another way of saying Father was an alcoholic. Dr. Montgomery wrote that drinking alcohol "could interfere with one's capacity to safely parent young children" and that Father "should maintain sobriety when parenting his children with and without supervision." Dr. Montgomery recommended that Father "should abstain from any further use of alcohol" and "should be monitored in some way for continued abstinence." He also stated that Father "should not parent his children until he can demonstrate sustained abstinence from alcohol." With regard to Mother, Dr. Montgomery noted Mother's history with depression and diagnosed her as suffering from a major depressive disorder that was in partial remission as well as a generalized anxiety disorder with panic attacks. He concluded that Mother's depression did not significantly interfere with her ability "to safely and independently parent her children."

The trial court also appointed Jamie Langley, a licensed clinical social worker, to provide counseling to the children. In her trial testimony, Ms. Langley said that she met with the children twenty-four times for close to a year. Mother's attorney asked Ms. Langley whether the children ever disclosed anything to her that she would categorize as "child abuse." Ms. Langley responded that "all three of them have been very consistent in terms of concerns about Dad's drinking." Ms. Langley continued:

They talk about that quite often. Sometimes I'll ask for descriptions, like how do you know Dad's drinking. Sometimes they'll describe behavior. They describe times he's fallen down and being helped, being picked up by the grandparents. The grandparents have to take him to the bathroom.

. . . .

What I noticed is even though the details were a little bit different, each child would say similar things about being concerned about Dad's drinking, about him being mean, calling them names, and then sometimes the falling-down behaviors.

Ms. Langley also testified about the children's reports of inappropriate touching by Father. She said that the older two children reported touching "on the bottom of their butt" during a cruise the children took with Father and his mother in the summer of 2019. The youngest child reported that Father had "scratched her butt" in February 2020 and then made another disclosure in April 2020. Ms. Langley testified that she believed the children's reports to her. Ms. Langley did not think the children were being coached to say the things they did about Father.

The children's pediatrician, Melita Bradley, testified by deposition. Dr. Bradley testified about an incident in November 2018 when the middle child told her that Father had gotten angry with him in the car and had "slapped him in the right side of his face and grabbed his ear and pulled it down." Dr. Bradley testified that she did not see any visible marks on the child's face when she examined him, but she made a referral to DCS based on the child's report. Both Mother and Father were in the office with the child during this appointment, and Dr. Bradley stated that Father became very upset when she said DCS would be there shortly to investigate the case. Dr. Bradley stated that Mother usually brought the children in for appointments and that she had seen Father at the children's appointments just a handful of times. Dr. Bradley testified that she thought Mother was "a very loving, kind mother to the children." Based on her interaction with the children, Dr. Bradley had no reason to believe Mother was coaching the children to report abuse allegations.

Dawn Hively, who was Father's girlfriend from August to about October 2018, testified at a proceeding in December 2018, and the transcript of her testimony was offered as an exhibit at trial. Ms. Hively testified that Father often consumed alcohol when she was at his house, regardless of whether the children were there or not. Ms. Hively stated that she observed Father's adding vodka to Gatorade on more than one occasion and letting the eldest child, who was seven at the time, drink some of it. Ms. Hively recounted a car trip, when she was driving, during which Father consumed an entire fifth of alcohol on the way to a wedding reception. The children were in the car and Father's middle child, who was then five years old, said, "Daddy, why are you talking weird? Daddy, why are you

acting weird?" Ms. Hively testified that Father usually tried to hide his consumption of alcohol around the children because "if [Mother] found out about it, that he would wind up in court." Ms. Hively stated the following about Father's drinking:

> Well, when I was there he would drink a lot, all the time, up to the point where no matter where we went, I would have to drive. For example, we had to drop the blankets off at [Mother]'s house. Well, he was so intoxicated, I had to drive to make sure the kids had their things at night. When I was with him, he would drink an incredible amount of alcohol all the time where he would pass out completely, be blacked out. He would be stumbling all over the place. Every time I was with him he was drinking. There was not a day he was not drinking, drinking in the middle of the day because he wasn't working, just always drinking. Every time I was there, he was drinking.

Ms. Hively also testified that Father told her that he lied in court so that he would get more time with the children. Ms. Hively stated that she was concerned for the children's welfare, but she also testified that she left Father and the children at a state park with no ride home one day when she became upset with the way Father was treating her.

Material Change of Circumstances

The trial court addressed each person's testimony introduced at trial and made some credibility determinations. As to Mother, the court wrote, "Specifically, as it relates to allegations of wrongdoing by [Father] and his family, [Mother] is not credible." The court further wrote:

> Although [Mother] did not make the majority of these referrals [to DCS], the Court finds [Mother] has encouraged the children to make incriminating statements about [Father] and his family to teachers, the counselor and others in her unrelenting effort to alienate the children from [Father]. [Mother] denies alienating conduct; however, the Court had the opportunity to observe her testify, observe her demeanor while doing so and these observations were extremely helpful in assisting the Court in determining credibility, not only with [Mother] but with all witnesses. . . . The only exception to this lack of finding of credibility on [Mother]'s part relates to [Father]'s alcohol consumption both during and after the marriage. . . . [T]he evidence is clear that [Father] has a problem with alcohol and that problem has impacted his relationship with his children. Specifically, the Court finds both parents are at fault for this. [Father] is clearly at fault for his excessive consumption of alcohol and [Mother] also bears fault by, in the Court's opinion, magnifying this issue with the parties' minor children, to their detriment.

> . . . .

- 23 -

Though clear [Father] has a problem with alcohol, this problem, from the viewpoint of the children, appears to have elevated only after Dr. Montgomery's report. The Court finds [Mother] has alerted the children to this issue and caused their concern over [Father]'s drinking to be elevated, in furtherance of her quest to eliminate [Father]'s involvement with his children.

The court found Detectives Pinson and Oeser credible and also found Captain Anderson credible. The court did not find Ms. Hively credible, writing: "A review of all the text messages reveals Ms. Hively misrepresented the truth frequently and the Court does not find Ms. Hively the least bit credible. She is in essence a disgruntled former girlfriend out to seek revenge on [Father]."

The trial court addressed Father's credibility as follows:

As with all the other witnesses, the Court had the opportunity to observe [Father]'s demeanor while testifying and that ability was substantially helpful in assisting the Court in determining credibility. The Court specifically finds [Father] was honest with the Court in his testimony but not honest with himself. [Father]'s denial of his alcohol problem indicates either he refuses to see the same or, alternatively, is misrepresenting that problem in court. The Court concludes [Father]'s denial is not an intentional misrepresentation but, rather, an unjustified refusal to acknowledge an obvious problem. This refusal is a common problem among individuals with substance abuse problems.

With regard to Father's alcohol use, the court wrote, in part:

[Father] has stated the relationship between the parties has progressively worsened over the last two (2) years with the allegations of sexual misconduct and alcohol abuse. This is understandable. As it relates to alcohol abuse, the Court specifically finds there has been no injury to the children as a result of [Father]'s alcohol use, he has suffered no work discipline, he has had no DUI's and he has not participated in any alcohol program, although perhaps he should. This does not mean [Father] does not have a problem.

The court made a finding as to Dr. Bradley's testimony and determined that Mother had influenced her to view Father in a negative light. The only testimony by Dr. Bradley the court considered was the lack of injury to the child who complained Father had hit him in the eye.

The trial court also addressed the deposition testimony and reports by the experts the court appointed to interview the parties and the children. As to Ms. Langley, the court wrote:

> Jamie Langley, licensed clinical social worker and the children's counselor, testified regarding her interactions with the children. She has reported concerns to DCS regarding [Father]'s consumption of alcohol and concerns regarding the children's well-being if [Father] is consuming alcohol during his parenting time. She acknowledged she did not investigate the truthfulness of the children's allegations but, rather, was helping the children dealing with the issues, whether real or perceived. Ms. Langley stated, and the Court fully accredits this statement; the children want their father to quit drinking. Ms. Langley further noted [Mother] had discussed the custody situation and investigation with the children and that this was inappropriate on [Mother]'s part.

As to Dr. Montgomery, the court stated, in part:

> As to [Father], Dr. Montgomery determined [Father] suffers from an Alcohol Use Disorder and the Court concurs with this conclusion. As to [Mother], Dr. Montgomery diagnosed her with a Major Depressive Disorder which began postpartum and has been recurrent as well as a feeling she may suffer from Generalized Anxiety Disorder, Inattentive Type.
>
> Dr. Montgomery opined both [Mother] and [Father] should abstain from alcohol consumption.

The trial court concluded that Father established that a material change of circumstances had occurred since the entry of the most recent parenting plan, and that the material change in circumstances consisted of Mother's significant escalation of the parental alienation that had begun by the time of the parties' divorce trial. Mother argues that the trial court erred in failing to find that Father's "alcoholism" was a material change in circumstance sufficient to modify the parenting plan to restrict or eliminate Father's residential time with the children. The parties introduced conflicting evidence, and we must rely on the trial court's findings of credibility because, unlike the trial court, we are not in a position to observe the witnesses or assess their demeaner. *See C.W.H.*, 538 S.W.3d at 495; *Armbrister*, 414 S.W.3d at 692-93. We conclude that Mother has failed to show that the evidence preponderates against the trial court's conclusion that Father proved a material change in circumstances pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(B). *See C.W.H.*, 538 S.W.3d at 495. We agree with the trial court's determination that Mother failed to show that Father's drinking has changed since the parties were married.

Best Interest Analysis

After concluding that Father established a material change of circumstances sufficient to change the primary residential parent designation pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(B), the trial court conducted a best interest analysis in accordance with Tenn. Code Ann. § 36-6-106(a). A court is required to consider the following factors in conducting this type of analysis:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if

necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). . . .;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

The trial court placed considerable weight on factor two and found as follows:

[T]his factor overwhelmingly favors [Father]. . . . [Mother] has denied [Father] parenting time in willful violation of the Court's Order, has interfered with his ability to obtain childcare during his parenting time and has expended substantial effort in attempting to alienate the children from the father. [Mother] has demonstrated neither a willingness nor an ability to "facilitate and encourage a close and continuing parent-child relationship" between the children and their father. Further, . . . [Mother] has not evidenced a likelihood to honor and facilitate court ordered parenting arrangements and her history clearly reflects this. [Mother] has been on a quest, apparently prior to the divorce and subsequent to the divorce, to eliminate [Father] from the lives of his children. She has been successful in having third parties, either wittingly or unwittingly, assist her in this regard. For example, there was no reason for Dr. Bradley to call the Department of Children's Services for the "black eye" incident. The same appears true with

most of the teachers. The court finds [Mother] has discussed these issues at length with the teachers and the children's pediatrician and influenced their perceptions of comments made by the children. Further, [Mother] continuously comes to court seeking to eliminate [Father]'s parenting time. When a particular allegation fails to accomplish this purpose a different allegation, unsupported by the evidence, is brought forth. When that one fails, there is another and another. It appears [Mother] will not rest until the children cannot ever see [Father].

The court found that the majority of factors favored neither party or else were not applicable. The court found that factor one favored Mother because Mother had performed the majority of the parenting responsibilities. The court also found that factor five slightly favored Mother because she had more parenting days than Father. The court found factors seven and ten favored Father:

Factor 7

This factor favors the father. The children emotionally need both parents. [Mother] has attempted to, and with some success, interfered with the emotional needs of the children and having a close relationship with their father. There is no evidence [Father] has reciprocated. In fact, he opposed the suggestion by his attorney that [Mother]'s parenting time be less than his.

Factor 10

This factor slightly favors the father. As evidenced by the proof, since the divorce, the mother has lived in three (3) different locations, although two (2) of them were with her parents, separated by a short stint in independent housing. Additionally, the children have attended three (3) different schools, although one of the changes of school was consented to by the father. [Father] has remained stable in his residence.

The court found factor eight favored neither parent and that factor eleven favored Father:

Factor 8

As noted above, [Father] clearly has a substance abuse problem and the problem has impacted the children emotionally. The Court finds this is due in part to [Father]'s continued abuse of alcohol and to [Mother]'s magnification of that issue to the children.

<u>Factor 11</u>

The court specifically finds neither party has been physically abusive to the children. Despite the numerous allegations against [Father] and his family, and the 15-18 referrals to DCS, none of these allegations have been substantiated. . . . As noted herein, [Mother]'s alienation is emotionally abusive to the children and has subjected them to numerous interviews with law enforcement and DCS. Accordingly, this factor favors [Father].

After addressing each of the best interest factors, the court stated the following, in part:

In the present case, the Court attaches significantly greater weight to factors involving [Mother]'s failure to facilitate and encourage a close relationship between the children and their father and finds this factor overwhelming. Thus, considering this and the totality of the circumstances, the Court finds it is in the best interest of the children to modify the existing Parenting Plan.

. . . .

As reflected in the Parenting Plan attached hereto and incorporated herein by reference, [Father] is hereby designated the primary residential parent. It is abundantly clear these parties are completely unable to communicate effectively and, thus, unable to co-parent effectively. Accordingly, sole decision-making regarding education decisions is hereby awarded to [Father]. This is based, in part, on [Mother]'s lack of stability in school zoning and [Mother]'s poisoning of school personnel against [Father]. Undoubtedly, [Mother] will not reside with her parents forever and, upon her relocation from her parents' home, this could cause yet another change in schools. [Father] has lived in his home for a period of years and currently has no plans to move. Accordingly, this will provide greater stability for the children.

Mother contends the trial court abused its discretion in changing the primary residential parent to Father and increasing his residential parenting time. Mother faults the trial court for not following Dr. Montgomery's recommendation that Father "should not parent his children until he can demonstrate sustained abstinence from alcohol." We disagree with Mother's assertion that the trial court ignored Dr. Montgomery's recommendations because the trial court's order restricts Father from consuming alcohol "in any quantity whatsoever during his parenting time with the children or for the twelve (12) hours immediately preceding his parenting time." In addition, the court has ordered Father to have no alcohol in his house "when exercising his parenting time with the

children." We conclude that, by conditioning Father's time with the children on his abstinence from alcohol while the children are in his custody as well as twelve hours beforehand, the court incorporated Dr. Montgomery's concerns into its order.[6]

As stated in a case upon which Mother relies, "'[e]xpert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony.'" *Burden v. Burden*, 250 S.W.3d 899, 915 (Tenn. Ct. App. 2007) (quoting *Thurmon v. Sellers,* 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001)); *see also Brunetz v. Brunetz*, 573 S.W.3d 173, 182 (Tenn. Ct. App. 2018); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 233 (Tenn. Ct. App. 2009). Unlike *Burden*, the trial court here did not disregard Dr. Montgomery's recommendation. *See Burden*, 250 S.W.3d at 915 (stating trial court "must have *some* valid evidentiary basis" to reach conclusions contrary to uncontradicted expert opinion). The court awarded the parties equal residential time with the children, and it explained that it was designating Father as the primary residential parent, in part, because he had a more stable residence and the children would not have to change schools due to changes in Mother's place of residence.

Mother further asserts that, in modifying the parenting plan, the trial court ignored Ms. Langley's testimony. Ms. Langley testified about the children's reports of Father's drinking and inappropriate touching, and she stated that she did not believe they were being coached. She did not investigate the children's reports, however, because that was not her job. The inappropriate touching allegations were investigated on numerous occasions by DCS and county sheriffs' offices, and all of the investigations were closed due to insufficient evidence. We believe the trial court addressed the children's complaints regarding Father's drinking appropriately by instructing him not to drink or have alcohol in his house when the children were present and to refrain from drinking twelve hours before he was to have time with the children.

Finally, we disagree with Mother's assertion that the trial court modified the parenting plan in an effort to "punish" her rather than serve the best interest of the children. The evidence showed that most of the allegations against Father occurred after Father had been consuming alcohol. By instructing Father to refrain from alcohol altogether when he has the children as well as twelve hours beforehand, the court addressed a majority of the

---

[6]The date of the trial court's order was June 19, 2020. We note that the record contains a transcript from a hearing conducted on June 2, after the trial concluded but before the final order was filed, based on an episode of Father's inebriation while the children were in his care and one or two of the children called 911. The police went to check on the children and had to break down the door to Father's house because Father refused to let the police enter. One of the police officers on the scene testified that Father shouted "you little assholes" to the children for calling the police. Father was charged with three misdemeanor counts of reckless endangerment. One of the responding officers made a referral to DCS, and the case was under investigation as of the hearing on June 2.

issues Mother raised against Father. The court did not, as Mother suggests, warn Mother against filing additional prayers for relief if the facts warrant it.

Mother has failed to show that the trial court abused its discretion in modifying the parties' permanent parenting plan. The facts the trial court found are supported by the evidentiary record, and we conclude that the court's modification of the parenting plan is among several acceptable alternatives the court could have adopted. *See Gonsewski*, 350 S.W.3d at 105. Accordingly, we affirm the trial court's judgment in all respects.[7]

### III. CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Lindsey Beth Honea, for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE

---

[7]Mother asks us to reverse the trial court's award of attorney's fees to Father, but she provides no argument in support of this request and we, therefore, consider the issue waived.

- 31 -